UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:

                                                              Case No.: 11-70038-ast

JOHN F. CAMPBELL and                                          Chapter 7
ELLEN T. CAMPBELL,

                                    Debtors.
---------------------------------------------------------X

## DECISION AND ORDER GRANTING MOTION FOR
## DISMISSAL UNDER 11 U.S.C. § 707(b)(3)

Pending before this Court is the motion (the "Motion") of Tracey Hope Davis, United

States Trustee for Region 2 (the "UST"), seeking the dismissal of this Chapter 7 bankruptcy case

as an abuse of the bankruptcy process, pursuant to 11 U.S.C. § 707(b)(3)[1] and Rule 1017 of the

Federal Rules of Bankruptcy Procedure. [dkt item 36]  For the reasons herein, the Motion is

granted.

### BACKGROUND

Procedural History

On January 6, 2011 (the "Petition Date"), John and Ellen Campbell (collectively, the

"Debtors") filed a joint petition for relief under Chapter 7 of Title 11, United States Code (the

"Bankruptcy Code").  [dkt item 1].  Along with the petition, Debtors filed their Statement of

Financial Affairs, [dkt item 1], a Certificate of Credit Counseling [dkt item 2], and their

Statement of Current Monthly Income and Means-Test Calculation (Official Form 22A) (the

"Means-Test Calculation").  [dkt item 3].  On January 6, 2011, the Clerk of Court issued a

Notice of Commencement of Case which, *inter alia*, provided notice that the meeting of creditors

---

[1] All statutory references in this Decision and Order are the Bankruptcy Code, §§ 101-1532, unless otherwise
indicated.

Decision and Order – p. 1

pursuant to § 341(a) (the "341 Meeting") was scheduled for February 2, 2011, and that Andrew M. Thaler was appointed the interim Chapter 7 trustee (the "Trustee"). On January 11, 2011, the Debtors filed their employees' income records/pay advices. [dkt item 9].

The initial 341 Meeting was held on February 2, 2011, and was adjourned on several occasions.

According to the Motion, on February 4, 2011, the UST commenced its investigation into whether or not this Chapter 7 case should be dismissed as a result of, *inter alia*, the Means-Test Calculation, by sending a letter to Debtors' counsel requesting certain documents. On March 3, 2011, Debtors responded to the UST's request, but failed to supply certain documentation. On March 3, the UST sent a second letter to Counsel requesting the production of pay advices for the six-month period preceding the Petition Date, as well as Mr. Campbell's pension and retirement income statement. Such documents were subsequently produced.

On April 1, 2011, pursuant to a stipulation between Debtors and the UST that was "So Ordered" by the Court, the last date for the UST to file a motion to dismiss under § 707(b) was extended to June 15, 2011. [dkt item 26].

On May 24, 2011, the date to file a motion under § 707(b) was further extended to July 31, 2011, pursuant to a stipulation that was "So Ordered" by the Court. [dkt item 34].

On July 25, 2011, the UST filed the Motion seeking to dismiss Debtors' Chapter 7 case as an abuse of the bankruptcy process pursuant to § 707(b)(3). [dkt item 36].

 On August 18, 2011, a continued § 341 Meeting was held and Debtors were examined by the Trustee.

On September 9, 2011, the Debtors and their counsel filed Affirmations in Opposition to the Motion (the "Opposition"). [dkt item 40].

On September 13, 2011, a hearing was held regarding the Motion and the UST was given an opportunity to file a reply to the Opposition. Debtors and the UST agreed that the Motion could be determined based upon the written submissions, and waived an evidentiary hearing.

On September 27, 2011, the UST filed a Reply to the Opposition (the "Reply"). [dkt item 42].

On September 28, 2011, the Court took the Motion under submission.

Debtors' Original Schedules

In Debtors' original schedules filed January 6, 2011 (the "Original Schedules"), Schedule A indicates that the Debtors jointly own a residence located at 147 Chardonnay Drive, East Quogue, Suffolk County, New York (the "Residence") with a stated market value of $950,000.00. Debtors' Schedule B shows personal property in the aggregate amount of $59,201.00, comprised of: (a) cash on hand of $50.00; (b) various bank accounts in the sum of $2,151.00; (c) household furnishings valued at $4,000.00; (d) clothing valued at $1,000.00; (e) jewelry valued at $1,000.00; (f) a 2008 Mercedes C300 (the "Mercedes") valued at $23,000.00; and (g) a 2005 Monterey Boat (the "Boat") valued at $28,000.00.

Schedule D lists two mortgages in the aggregate sum of $1,073,360.70 that encumber the Residence, and liens in favor of Mercedes Benz Financial in the amount of $31,666.00 against the Mercedes, and to Teachers Federal Credit Union ("TFCU") for $33,292.00 against the Boat.

Schedule E lists a priority claim for equitable distribution owed to Patricia Fellows, Mr. Campbell's former spouse, in the amount of $20,000.00.

Schedule F lists unsecured claims in the amount of $350,000.00.

Schedule G lists a lease obligation for a 2008 Chrysler Minivan (the "Minivan").

In their Statement of Intention, Debtors indicate that they planned to retain their interest in the Residence, the Mercedes and the Boat, but did not plan on assuming the Minivan lease. [dkt item 1].

Debtors' Original Schedules reveal that Debtors are married with two dependents, and that their 2010 combined annual household income exceeded $232,000; this is an amount that exceeded New York State median income by $150,116.00.  Schedule I provided that Debtors' net monthly income is $11,866.00, which would result in an annual income that exceeded the New York State median income by approximately $60,508.00.  Debtors' Schedule J listed monthly expenses of $17,535.21.  This created a deficit of $5,669.32 per month.

Schedule J listed various expenses which were considered excessive or lavish by the UST.  These included a monthly mortgage payment of $7,230.00, a monthly home maintenance expense of $800.00, medical expenses of $1,000.00 per month, a monthly installment payment for the Boat in the sum of $422.00, and a monthly payment of $751.47 for the Mercedes.  Based upon the Original Schedules, the UST argues in the Motion that Debtors' actions demonstrate a bad faith attempt to discharge their unsecured debts in the amount of $350,000.00, while perpetuating their improvident pre-petition financial decisions, and keeping their Residence, Mercedes, Boat and other amenities that they have been unable to afford for several years.

Denial of Reaffirmation of the Mercedes

On February 23, 2011, Debtors filed a motion to reaffirm the indebtedness on the Mercedes (the "Reaffirmation Motion"), which would have required monthly payments of $751.47 for forty one months.  [dkt item 12].  Because Debtors' Schedules I and J revealed a $5,669.32 monthly deficit, the presumption of undue hardship was triggered under § 524(c)(3)(B), necessitating a hearing under § 524(m).  A hearing was held on March 22, 2011,

at which Debtors stated that they had made significant changes to their expenses by, among other things, deciding to surrender their Residence.  The Court directed the Debtors to amend Schedules I and J, and adjourned the hearing to June 7, 2011; however, Debtors did not amend their Schedules, nor did they appear for the adjourned hearing.  Thus, on June 7, 2011, the Court determined that Debtors were unable to prove that the monthly payments could be satisfied and denied the reaffirmation agreement for the Mercedes.

Amended I & J Schedules

According to the Motion, on July 12, 2011, counsel for the Debtors sent a letter to the UST advising that Mr. Campbell had lost his consulting employment in June 2011.  Also on July 12, 2011, the Debtors filed their amended Schedules I and J (individually "Amended Schedule I," "Amended Schedule J" or collectively "Amended I & J").  [dkt item 35].  The Amended Schedule I shows a reduction of Debtors' monthly income to $10,304.56 from the $11,866.00 set forth in the Original Schedule I.  Debtors' stated reasons for the reduction was, *inter alia*, that Mr. Campbell was no longer receiving the $3,000.00 a month in gross income attributable to his consulting business, but that Mrs. Campbell's monthly pay increased from $9,859.00 to $10,477.00.

The Amended Schedule J shows a reduction in total monthly expenses from $17,535.51 to $12,585.00.  The reasons for the reduction in the expenses are as follows: (1) Debtors replaced the home mortgage payments of $7,230.00 with an estimated $3,000.00 monthly rental expense; (2) the home maintenance expense was reduced from $800.00 to $100.00; (3) the medical expense was reduced from $1,000.00 to $602.88; (4) health insurance was reduced from $206.00 to $00.00; and (5) the monthly payment of $422.00 for the Boat was removed.  However, Debtors were still deducting $1,350.00 in expenses associated with Mr. Campbell's employment

even though he was no longer employed, and were deducting $1,328.56 for auto installment payments even though the Mercedes and Minivan had been or were going to be surrendered. Overall, Debtors stated monthly deficit decreased from ($5,669.32) to ($2,281.66).

Second Amended Schedule J

On September 9, 2011, Debtors filed their second amended Schedule J ("Second Amended Schedule J"). [dkt item 40, Exhibit C]. The Second Amended Schedule J lists average monthly expenses of $9,973.66, which was a reduction of $2,611.34 from the total monthly expenses of $12,585.00 listed on Amended Schedule J. There were three reasons for the decrease: (1) Debtors removed the expense of $1,350.00 associated with Mr. Campbell's employment; (2) Debtor reduced the auto installments payments from $1,328.56 to $592.00; and (3) Debtors removed the expense of $526.00 for alimony, maintenance, and support. Due to the reduction of expenses, the statement of monthly net income on the Second Amended Schedule J listed monthly net income in the amount of $330.90. Despite the presence of positive monthly net income, an amended Means-Test was not filed.

## DISCUSSION

The UST's Motion to dismiss is predicated solely upon 11 U.S.C. § 707(b)(3); the Motion does not allege abuse based upon the analysis provided under § 707(b)(2). Section 707(b)(3) authorizes a court to dismiss a debtor's chapter 7 bankruptcy case when the particular circumstances of the filing of the case demonstrates abuse of the bankruptcy process. In pertinent part, § 707(b)(3) provides that, in considering whether to dismiss a chapter 7 case in which a debtor has primarily consumer debts as an abusive filing, the court shall consider:

      A. Whether the debtor filed the petition in bad faith; or

      B. The totality of the circumstances (including whether the debtor seeks to reject a personal service contract and the financial need

> for such rejection as sought by the debtor) of the debtor's
> financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3) (2011). *See In re Perelman*, 419 B.R. 168 (Bankr. E.D.N.Y. 2009); *In re Colgate*, 370 B.R. 50 (Bankr. E.D.N.Y. 2007). Debtors do not deny that their debts are primarily consumer debts.

In 2005, Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). BAPCPA made numerous changes to the Code, including amending section 707(b)(1) to provide for dismissal of a chapter 7 case for abuse. Prior to BAPCPA, a chapter 7 case could be dismissed for "substantial abuse" under § 707(b)(1). Thus, Congress lowered the threshold which the UST must satisfy to obtain dismissal of a case under § 707(b). *Perelman*, 419 B.R. at 172; *Colgate*, 370 B.R. at 54-55. Further, BAPCPA removed a statutory presumption previously found in § 707(b)(1) in favor of granting a debtor relief under chapter 7. *Id.* A court may now dismiss a case under § 707(b)(1) if granting the debtor relief would be an abuse of the bankruptcy process, as determined under either: (i) the "means test" of § 707(b)(2)(A)(i); (ii) § 707(b)(3)(A) for bad faith in filing the case; or (iii) § 707(b)(3)(B) under the totality of the circumstances. *See Perelman,* 419 B.R. at 176; *Colgate*, 370 B.R. at 55; *In re Naut*, 2008 WL 191297, at *3 (Bankr. E.D. Pa. 2008). "Section 707(b)(3) bifurcates 'bad faith' and 'totality of circumstances' as grounds for dismissal by listing them in separate subparagraphs phrased in the disjunctive." *Perelman*, 419 B.R. at 177. A case can be dismissed under § 707(b)(3) whether or not the presumption of abuse has arisen and been rebutted under § 707(b)(1), (2).

The movant bears the burden of proving abuse under § 707(b)(3)(A) and (B) by a preponderance of the evidence.[2]  *See Perelman*, 419 B.R. at 177-78; *In re Durczynski*, 405 B.R. 880, 883 (Bankr. N.D. Ohio 2009); *In re Goble*, 401 B.R. 261, 274 (Bankr. S.D. Ohio 2009); *In re Ansar*, 383 B.R. 344, 348 (Bankr. D. Minn. 2008); *In re Perrotta*, 378 B.R. 434, 437 (Bankr. D. N.H. 2007) ("the burden of proof is on the moving party to establish that the case was filed in bad faith or that the totality of the circumstances of a debtor's financial situation demonstrates abuse."); *In re Oot*, 368 B.R. 662, 665 (Bankr. N.D. Ohio 2007).

## A. Bad Faith

"Under § 707(b)(3)(A), a bad faith filing is defined as the act of submitting a bankruptcy petition that is inconsistent with the purposes of the Bankruptcy Code or is an abuse of the bankruptcy system (that is, by not being filed in good faith)."  *In re Hornung*, 425 B.R. 242, 248 (Bankr. M.D.N.C. 2010) (internal citations omitted).  A finding of motivation or intent is not necessary to prove bad faith under § 707(b)(3)(A).  *In re Webb*, 447 B.R. 821, 824 (Bankr. N.D. Ohio 2010).  "Rather, for purposes of § 707(b)(3)(A), bad faith may be found to exist when it is determined that the filing of the case is inconsistent with the Bankruptcy Code or its policies thereunder, even though the filing may otherwise be lawful."  *Id.*; citing *In re Hageney*, 422 B.R. 254, 259–60 (Bankr. E.D. Wash. 2009).  Thus, a dishonest or nefarious act may be sufficient to prove bad faith. *Webb*, 447 B.R. at 824.  In addition, bad faith may be evidenced by the debtor's eve of bankruptcy purchases, incomplete or false schedules, or by failing to cooperate with the bankruptcy trustee.  *Colgate* 370 B.R. at 57-58; *Hageney*, 422 B.R. at 248.

The UST asserts that Debtors showed bad faith by attempting to retain their luxury assets while discharging their consumer debts.  The items on Schedule J that were deemed excessive by

---

[2] Because the UST's Motion to dismiss is predicated solely upon 11 U.S.C. § 707(b)(3), the UST has the burden of proving abuse even though Debtors would fail the presumption of abuse test under 11 U.S.C. § 707(b)(1)-(2) based upon their income and expenses. *See infra* page 15.

the UST included the monthly mortgage payments of $7,230.95, monthly auto installment payments of $1,328.56, and monthly installment payments of $422.00 for the Boat. The UST cites *In re Boyle*, 412 B.R. 108 (Bankr. N.D.N.Y. 2009) in support of its argument that Debtors showed bad faith by rejecting the decision to repay their debts through Chapter 13 while enjoying the continued use and enjoyment of their luxurious possessions.

In *Boyle*, the court concluded that the debtors' chapter 7 case was filed in bad faith because the debtors filed bankruptcy to retain a luxury 28-foot boat that they could not afford. The debtors were devoting $800.00 per month to pay the debt on their boat, an obligation which they intended to reaffirm in their Chapter 7 bankruptcy:

> [T]his court finds abuse in the debtors' attempt to use bankruptcy as a means to perpetuate rather than to correct the improvident practices that caused the debtors to default on their financial obligations . . . . Essentially, [the debtors] seek to reaffirm an undersecured boat loan, but to otherwise discharge all of their other legitimate debts. Thus, they would perpetuate the cause of their financial problems and perhaps thereby invite the prospect of default on future obligations. Moreover, in pursuing this approach, they implicitly reject a more responsible alternative, namely to surrender the boat and to redirect their boating expenses into a Chapter 13 plan providing for some meaningful repayment of allowed claims.

*Boyle*, 412 B.R. at 111–12.

The facts in *Boyle*, however, do not run parallel to the ones presented here. Unlike the debtors in *Boyle*, while the Debtors here initially intended to retain the Residence, Mercedes and Boat, they will now have to surrender all of these, as they can no longer afford them. This Court denied reaffirmation of the Mercedes. Debtors surrendered the Boat in July 2011 after negotiations to reduce the loan were unsuccessful. Debtors stated they will surrender their Residence.

After surrendering these items, Debtors were able to procure two cost effective vehicles. In their Opposition, Debtors stated that the daughter from Mr. Campbell's first marriage obtained

financing on a Hyundai Sonata (the "Sonata") in August 2011 with payments of $296.00, and took out a second loan in her name on a Hyundai Elantra (the "Elantra") with payments of $294.00 per month; Debtors have agreed to take over the payments and use these vehicles. The total cost for the Sonata and the Elantra (the "New Cars") is approximately $592.00 per month, which is now the amount listed on the Second Amended Schedule J. [dkt item 40, Exhibit C].

Had Debtors made their lifestyle changes pre-petition, they would have started this case by projecting the financial picture now reflected in Debtors' Second Amended Schedule J, which lists total monthly expenses of $9,973.66. This Court finds the actions that were taken by Debtors were necessary to tighten their financial belts, and, although these decisions were neither voluntary nor made prior to filing, this type of conduct alone would not lead this Court to find bad faith in the filing of this case.

The UST argues that Debtors portrayed a lack of candid financial disclosure on their schedules.[3] Debtors failed to advise the UST that Mrs. Campbell receives reimbursement of medical and dental expenses from her employer. Debtors listed $1,000 for medical expenses on Schedule J then subsequently changed the amount to $602.88 on Amended Schedule J. Debtors state that the annual unreimbursed medical expenses and prescriptions for doctor's visits and for dental visits for the family of four is approximately $6,500.00 and the additional annual expense for dog care is approximately $900.00. Debtors also listed business expenses in the sum of $1,350 on Amended Schedule J even though Mr. Campbell's consulting job ceased in June 2011. Mr. Campbell states that he forgot to eliminate this expense from Amended Schedule J, and

---

[3] The UST also stated that Debtors increased discretionary spending of approximately $1,173.32 per month during the period between January 1, 2010 and June 30, 2010 for recreation and sports, clothing and household expenses before filing bankruptcy. The Debtors, however, provided documentation for the increase. Debtors stated that they spent approximately $3,000.00 per year for seasonal recreation for their two teenagers and that the period in question involved expenses for a seasonal sport not offered in the fall. Further, Debtors stated that they were forced to spend over $250.00 to replace an engine in the Minivan, and $1,000 as a rental car expense for travel to and from work as a corollary to the engine problem. Debtors also replaced their living room furniture in the amount of $2,000.00 because it was severely damaged by their dogs.

Decision and Order – p. 10

corrected this expense item by eliminating it on the Second Amended Schedule J. This conduct demonstrates Debtors willingness to correct the errors on their schedules after the discovery of such mistakes was brought to their attention; however, this does not excuse Debtors from making these errors in the first place.

As a final point, the UST argues that Debtors were not forthright in their Original Schedules by not stating their ownership of a Jeep vehicle (the "Jeep"). Debtors testified in their affidavit that the Jeep was traded in on some undisclosed date in 2010 and that it was replaced with the Elantra. The Jeep never appeared on the Original Schedules, and it was only by the persistent request for documents by the UST that Debtors disclosed the Jeep's existence. The UST argues that Debtors' statements in their Opposition are incorrect because Debtors made monthly payments on the Jeep to Chrysler Financial in the amount of $449.79 up through and including February 7, 2011. The UST provided a payment history for the Jeep which listed a monthly payment of $449.79 to Chrysler Financial on February 7, 2011. [dkt item 42, Exhibit A]. This payment was made approximately one month after Debtors' bankruptcy filing. In addition, Debtors' Schedule D does not list Chrysler Financial as holding a lien on a Jeep. [dkt item 1]. Debtors partially corrected the mistake by disclosing the existence of the Jeep in their Opposition and by excluding the Jeep's monthly payments from their Second Amended Schedule J; again, this does not excuse Debtors from making these errors in the first place or from failing to list the Jeep as an asset on their Schedules.

This Court does not condone Debtors' need to make a series of changes to their disclosures to this Court and to creditors. However, this Court concludes that the UST has not met their burden of proof that Debtors' conduct constitutes bad faith by the preponderance of the evidence, even in aggregating these non-disclosures. Debtors amended their schedules and

disclosures to provide accurate information.  They cooperated, albeit slowly, with all discovery requests and worked with the UST to provide proper disclosure.  Accordingly, the Court will not dismiss Debtors' chapter 7 case as a bad faith filing under 11 U.S.C. § 707(b)(3)(A).

**B.  Totality of the Circumstances**

Courts considering dismissal of a Chapter 7 case under the totality of the circumstances test of § 707(b)(3)(B) employ a two-part test developed pre-BAPCPA, which analysis was affirmed by the Second Circuit in *Kornfield v. Schwartz (In re Kornfield)*, 214 B.R. 705 (W.D.N.Y.), *aff'd, In re Kornfield*, 164 F.3d 778 (2nd Cir. 1999).  Under this two-part test, courts first look to whether the debtor has the ability to pay a substantial dollar amount or percentage of her unsecured debts, and then to any other relevant circumstances to determine whether there are any mitigating or aggravating factors.  *Colgate*, 370 B.R. at 56

*1.  Ability to Pay*

"For purposes of an ability to pay analysis under § 707(b)(3), a debtor's disposable income is defined generally as that income received by a debtor which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor."  *In re Hoke*, 447 B.R. 835, 837 (Bankr. N.D. Ohio 2011); citing *In re Pier*, 310 B.R. 347, 353 (Bankr. N.D. Ohio 2004).  The UST argues that granting relief to the Debtors under chapter 7 would be an abuse of the bankruptcy process because Debtors would have $3,300.00 in excess income every month to repay creditors, if the Second Amended J was further amended to eliminate unnecessary expenses.  However, the UST did not provide its calculation to arrive at this $3,300.00 per month.

In the Motion, the UST provided a chart to demonstrate that Debtors have the ability to repay a substantial portion of their debts.  The Court has replaced the expenses listed by Debtors

in Amended Schedule J with those listed in Debtors' Second Amended Schedule J, in order to

accurately state Debtors revised expenses in the chart that follows, which includes the expenses

the UST believes are inappropriate:

[REMAINDER OF PAGE LEFT BLANK]

| Expenses | Debtors' 2nd Amend.Sch."J" | UST's analysis | Difference |
|---|---|---|---|
| Mortgage | $3,000 | $0 | $3,000 |
| Utilities | $746 | $746 | $0 |
| Water and sewer | $40 | $70 | ($30) |
| Telephone | $279 | $279 | $0 |
| Sirius Satellite Radio, Cablevision and trash collection | $325.50 | $325.50 | $0 |
| Home maintenance | $100 | $100 | $0 |
| Food | $1,000 | $1,000 | $0 |
| Clothing | $350 | $260 | $90 |
| Laundry and dry cleaning | $60 | $10 | $50 |
| Medical and dental | $602.88 | $560 | $42.88 |
| Transportation | $650 | $0 | $650 |
| Recreation | $550 | $0 | $550 |
| Charitable contributions | $220 | $220 | $0 |
| Life insurance | $50 | $29 | $21 |
| Auto insurance | $210 | $0 | $210 |
| Income tax | $1,198.28 | $1,198.28 | $0 |
| Auto installment payments | $592 | $0 | $592 |
| Alimony, maintenance and support to others | $0 | $526 | ($526) |
| Regular expenses from consulting | $0 | $0 | $0 |
| **Total Expenses:** | $9,973.66 | $5,323.78 | $4,649.88 |

As noted above, Debtors have now stated a combined average monthly income of $10,304.56 and monthly expenses of $9,973.66. This monthly income results in an annual income that exceeds the New York State median income by $41,770.72. Debtors now state they have $330.90 per month of net income, while the UST argues that, when using its expense figures, Debtors would have net monthly income of $4,980.78 which should be used to repay Debtors' unsecured creditors. [dkt item 31].

To make the determination whether Debtor has disposable income to pay creditors, the Court must analyze which of the expenses the UST challenges as unreasonable and why. "When assessing the amount of disposable income available to the debtor, the Court is not required to accept at face value the financial figures put forth by the debtor. Rather, in its role as the trier-of-fact, the Court may make downward adjustments in a debtor's expenses where it is determined that such expenses are not reasonably necessary." *Hoke*, 447 B.R. at 837-38. Some courts have considered the Internal Revenue Service Collection Standards (the "IRS Standards"), which have been grafted onto the Bankruptcy Code through the means test calculation set forth in § 707(b)(2), to analyze whether Schedule J expenses are reasonable when evaluating the totality of the circumstances under § 707(b)(3)(B); however, these courts have made it abundantly clear the IRS Standards alone do not determine reasonable expenses. *In re Gearheart*, 2010 WL 486617, at *3 (Bankr. M.D. Pa. Nov. 23, 2010); *In re Dumas*, 419, B.R. 704 (Bankr. E.D. Tex. 2009); *In re Cutler*, 2009 WL 2044378 (Bankr. S.D. Ind. July 9, 2009). Difficulties can arise in substituting the IRS Standards for certain Schedule J expenses because "such an approach fails to consider whether the actual expenses scheduled are reasonable in the context of the Debtors' current situation." *Cutler*, 2009 WL 2044378, at *5; *see In re Baeza*, 398

B.R. 692, 697 (Bankr. E.D. Cal. 2008) ("By the plain meaning of § 707(b)(3)(B), the court must consider the Debtors' actual financial situation.").

Other courts have used the IRS Standards as a benchmark in determining abuse under § 707(b)(3). *See In re Talley*, 389 B.R. 741 (Bankr. W.D. Wash. 2008) (abuse found where housing expense was three times the IRS standard); *In re Kaminski*, 387 B.R. 190 (Bankr. N.D. Ohio 2008) (abuse found where housing expense was more than twice the IRS standard).  In such cases, courts have stated that "when a debtor's housing allocation significantly exceeds the IRS allowance, a viable justification for the necessity and reasonableness of that housing expense should be offered." *Kaminski*, 387 B.R. at 196.

a.  Housing and Utilities

This Court believes that the question of reasonableness in the context of Debtors' current circumstances and actual financial condition can be resolved by considering the housing expenses challenged by the UST as unreasonable.  The UST's primary objection is to Debtors' original monthly mortgage payment of $7,230.95 because Debtors had not paid the mortgage payments since December 2008.  That objection is moot because Debtors now list a rental expense of $3,000.00.[4]  Further, because Debtors have continued to amend their schedules, this Court can and will consider their actual post-petition income and expenses. *See Perelman,* 419 B.R. at 173-75.

The Internal Revenue Service Local Standards for Suffolk County, New York (the "IRS Local Standards") lists a maximum monthly allowance for housing and utilities of $3,232.00 for a family of four.  The Internal Revenue National Standards (the "IRS National Standards") also

---

[4] Because Debtors no longer claim the Residence mortgage payment as an expense and because the UST did not raise abuse under §707(b)(2), this Court need not reach the issue of whether Debtors could have deducted the mortgage payment for means-test purposes under § 707(b)(2)(A)(iii), even after Debtors' abandoned their original intention to retain the Residence. *See Perelman*, 419 B.R. at 173-75.

list a housekeeping supplies expense of $74.00 for a family four, allowing for a total monthly housing expense of $3,306.00.  Debtors list $3,000.00 per month as their rent expense and $786.00 per month for utilities, but do not list a separate housekeeping supplies expense. Therefore, Debtors' claimed expenses for housing including utilities is $3,786.00, which is $480.00 greater than the IRS Local Standards.  Further, this Court has no evidence that Debtors have in fact signed a lease or begun to pay rent.  Debtors have not filed a change of address with this Court as required by Rule 4002(5) of the Federal Rules of Bankruptcy Procedure, nor has the stay been lifted to allow foreclosure of the Residence; thus, Debtors may not have moved out of the Residence and begun to pay rent.  Debtors have not explained why their projected housing expenses exceed the IRS Local Standards and the IRS National Standards (collectively the "Combined IRS Standards") by over 10%.

Thus, when this $480.00 per month above the Combined IRS Standards for housing is added to the surplus of $330.90 per month Debtors stated, Debtors would have $810.90 per month to pay their creditors, who have filed claims totaling $340,569.36.  Under a sixty (60) month plan, Debtors could pay $48,654 to their unsecured creditors, a dividend of 14.29% if all claims were allowed in the amount filed; these are significant distributions that could be made to unsecured creditors.

The other expenses in dispute by the UST are the amounts listed for clothing, laundry and dry cleaning, medical and dental, transportation, auto insurance, auto installments, and recreation.  These expenses will be analyzed in turn as they could increase the funds available for creditors in a chapter 13 case.

b.  <u>Clothing, Laundry and Dry Cleaning</u>

The UST states that Debtors' bank statements document that Debtors spent $3,080.37 in clothing in 2010, or approximately $260.00 per month.  Debtors also list laundry and dry cleaning as $50.00 per month even though Debtors only spent $107.50 in 2010, thereby increasing the monthly expense for clothing, laundry and dry cleaning to $310.00 per month. The UST argues that Debtors overstated the clothing expense by $90.00 per month and the laundry and dry cleaning expense by $40.00.  The IRS National Standards for apparel and services for a family of four is $244.00 per month.  Therefore, according to the IRS National Standards for apparel and services, Debtors expenses for this category would be overstated by $64.00 per month.

c.  <u>Medical and Dental</u>

Debtors list $602.88 per month for medical and dental expenses.  The UST reviewed Debtors' pay advices and concluded that Debtors overstated the medical expenses by approximately $43.00 per month.  Debtors stated in their Opposition that the reason for the discrepancy was that the UST omitted the medical expenses for Debtors' dogs, which was approximately $900.00 in 2010, and that the omitted expense makes up the difference.  This Court notes that Debtors' expenses for medical and dental are nearly ten times the IRS National Standards for out-of-pocket health care expenses, which only allows $60.00 per month in fees.

d.  <u>Transportation, Auto Insurance and Auto Installments</u>

The UST also argued that the expense listed for transportation, auto insurance, and auto installments are unsubstantiated because Debtors lost the contractual rights to the Mercedes and the Minivan.  However, as previously noted, Debtors surrendered the Mercedes, the Minivan and the Jeep, and took over payments of the New Cars in the sum of $592.00 per month.  Debtors

argue in their Opposition that the monthly expenses of $650.00 for transportation, $210.00 for auto insurance, and $592.00 for the auto installments, for a combined expense of $1,452.00 per month, are reasonable for the New Cars and the necessity of driving forty (40) miles back and forth to work. The IRS National Standards allow an expense of $992.00 per month as ownership costs for two vehicles. The IRS Local Standards lists an expense of $684.00 per month as operating costs for two vehicles. Therefore, according to the Combined IRS Standards, the total monthly expense allotted to transportation, insurance and auto installment payments is $1,676.00 per month. Debtors' monthly expenses for this category are $224.00 less than the IRS Standards.

e.  Recreation

The last area of concern for the UST was Debtors' recreation expense, which is listed as $550.00 per month. The UST states in its Motion that Debtors failed to provide documentation to support a $550.00 expense. Debtors argued that these expenses derived substantially from Debtors' teenagers, who are engaged in several seasonal extracurricular activities. The IRS National Standards for clothing and other items lists monthly expenses of $235.00 for miscellaneous items and $67.00 for personal care products and services. Utilizing this comparison, Debtors' monthly expenses for recreation are overstated by $248.00 per month.

f.  Aggregate of Non-Housing Expenses

In the aggregate, the categories of recreation, transportation, medical and dental, and clothing could provide an additional $630.88 per month for creditors if adjusted to the Combined IRS Standards. Thus, creditors might be able to receive $1,441.78[5] per month over a sixty (60) month chapter 13 plan for a total of $86,506.80, equating to a possible dividend of 25.4%; these would be significant distributions.

---

[5] This amount was calculated by adding the difference of $630.88, for the adjustment of Debtors' expenses to the Combined IRS Standards, plus the difference of $480.00, for the adjustment of Debtors' housing and utility expenses to the IRS Local Standards, plus the net monthly income of $330.90 as noted on Debtors' Schedules.

2.  *Other Relevant Circumstances*

After the Court establishes that Debtors have an ability to pay a substantial amount to

their unsecured creditors, the Court is to look to the *Kornfield* factors to see if these factors

mitigate towards dismissing the case or denying the Motion.  *Colgate*, 370 B.R. at 57.  These

factors include:

> (1) whether the bankruptcy was filed as a result of sudden illness, calamity, disability or unemployment;

> (2) whether the petition was filed in good faith;

> (3) whether the debtor exhibited good faith and candor in filing his schedules and other documents;

> (4) whether the debtor has engaged in "eve of bankruptcy purchases";

> (5) whether the debtor was forced into chapter 7 by unforseen or catastrophic events;

> (6) whether the debtor's disposable income permits the liquidation of his or her consumer debts with relative ease;

> (7) whether the debtor enjoys a stable source of future income;

> (8) whether the debtor is eligible for adjustment of his or her debts through chapter 13 of the Bankruptcy Code;

> (9) whether there are state remedies with the potential to ease the debtor's financial predicament;

> (10) whether there is relief obtainable through private negotiations, and to what degree;

> (11) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities;

> (12) whether the debtor has significant retirement funds, which could be voluntarily devoted in whole or in part to the payment of creditors;

> (13) whether the debtor is eligible for relief under chapter 11 of the Bankruptcy Code; and

(14) whether there is no choice available to the debtor for working out his or her financial problems other than chapter 7, and whether the debtor has explored other alternatives.

*Colgate*, 370 B.R. at 55–56; *In re Carlton,* 211 B.R. 468 (Bankr. W.D.N.Y. 1997), *Kornfield*, 164 F.3d at 781-83.

In *Colgate*, Judge Eisenberg of this Court provided well-reasoned guidance in analyzing the impact of aggravating or mitigating factors in the determination of whether dismissal is warranted. 370 B.R. 50. In *Colgate*, the Court granted the UST motion to dismiss because there was an absence of significant mitigating factors in favor of the debtor. 370 B.R. at 58. The debtor in *Colgate* did not file the bankruptcy petition as a result of increasing debt due to illness, unemployment or other emergency. *Id.* at 57. The debtor filed bankruptcy because of overspending. *Id.* The court determined that "the most critical factors in this inquiry is that the [d]ebtor did not exhibit good faith and candor in filing his schedules." *Id.* at 57. The court reasoned that debtor significantly overstated his auto expenses, the amount of rent he was paying to his mother in law, and his dry cleaning expenses. *Id.* The court also determined that the debtor was not providing adequate explanations regarding certain expenses, and he was omitting commissions he was receiving from his employer. *Id.* at 58. The court concluded that the aggravating factors in light of the absence of mitigating factors weighed in favor of dismissing the debtor's chapter 7 case. *Id.*

These Debtors share many similarities with the debtor in *Colgate.* Debtors overstated many of their expenses, and they appear to have a relatively stable source of income. Debtors did not exhibit complete good faith and candor by making numerous errors which required multiple amendments to their Schedules. Unlike the debtor in *Colgate*, however, Debtors have proven the existence of certain mitigating factors. Debtors explained the reason for their

bankruptcy filing.  Debtors stated that Mr. Campbell's business, Campbell, Campbell & Fleming, Inc., failed in 2008 and Mr. Campbell was unable to collect a salary during 2007 and 2008.  Then Debtors faced more hardship as Mr. Campbell obtained a position with Hampton Properties in 2008 as a real estate broker and the real estate market collapsed shortly thereafter.

On balance, Debtors did attempt to maintain a lifestyle they could not afford well after the 2008 market collapse; a more reasonable lifestyle can be enjoyed with $10,304.56 per month of income, even awhile incurring $8,862.78[6] of expenses; this strikes a balance between Debtors' needs for a fresh start with the rights of creditors to be paid in a manner commensurate with the purposes and policies of the Bankruptcy Code.  Therefore, the Court will dismiss the Debtors' chapter 7 case under the totality of the circumstances under 11 U.S.C. § 707(b)(3), unless Debtors seek to convert to chapter 13.[7]

---

[6] This amount was calculated by subtracting the $1,441.78 detailed above from Debtors' monthly expenses of $9,973.66, as listed on the Second Amended Schedule J.  *See supra* note 4.

[7] This Court is cognizant of the fact that a chapter 13 case may require additional attorney fees and expenses but such additional fees and expenses would be only a fraction of the total funds made available to repay creditors.

## CONCLUSION

Based on the foregoing, it is hereby;

**ORDERED**, that the Motion for dismissal under 11 U.S.C. § 707(b)(3) is GRANTED; and it is further

**ORDERED**, that this case will be dismissed on <u>**March 6, 2012**</u>, unless Debtors file and serve a motion to convert to chapter 13 before such date.



Dated: **February 1, 2012**
      **Central Islip, New York**

_____
           **Alan S. Trust**
    **United States Bankruptcy Judge**